Mr. Justice Hagner
delivered the opinion of the Court:
This case was argued at a prior term of this court, which then reversed the decree of the court below, directing that the deed executed by the defendant Doran to the defendant Stewart should be set aside because of its fraudulent character. There was little doubt, as I understand, in the minds of the judges who sat in the case that the proceeding was an extremely suspicious one, and that the deed was; probably fraudulent, but they were not prepared to declare the evidence then presented was sufficient to require a decree to that effect.
The case has been heard anew at this term, and we have examined it with great care. Some matters not then presented or much considered have received further attention, and we have all come to the conclusion that the decree be *165 low was correct, and that the former judgment of this court ought not to stand.
The bill alleged that the complainant, on the 14th of November, 1888, recovered a judgment in the Circuit Court against Doran for $650 and costs; that a writ of fieri facias was issued on which only $66.98 was made on execution, and as to the residue the return of nulla bona was made; that Doran at that time was in possession, as he had been for a long time previous, of the land described in the bill; that, in November, 1887, after the suit at law was commenced, he had executed a deed of trust to the defendant building association, to secure $1,500 borrowed by him; that after the verdict had been rendered against him in the Circuit Court, Doran executed the deed of the property complained of to the defendant Stewart for the alleged consideration of $600; that Stewart took no steps to have the title of the property examined, as any prudent bona fide purchaser would have done; that Stewart was an intimate acquaintance and associate of Doran, and was well awar.e of the rendition of the verdict against Doran, and of the fact that Doran intended by that deed to convey the property with the purpose to hinder, delay and defraud the complainant in the collection of his judgment, and that the property was conveyed to Stewart upon a secret trust; that ever since the conveyance Doran has been in the possession of the property, using it as his own, and has been paying money to the building association upon the deed of trust which he had previously executed, and that the purpose of the entire proceeding was to defraud and cheat the complainant. The bill contained very searching interrogatories in the exacting terms of the older forms, demanding that specific answers should be made by the two defendants according to the best and utmost of their several and respective corporal oaths, and concluded with the prayer that the deed should be set aside as fraudulent.
THe dates are of importance. The suit at law, commenced on the nth of December, 1886, was an action for *166 false imprisonment brought by the plaintiff against -the defendant Doran. The defendant Doran in liis answer to this bill, in speaking of this judgment, declares he does not now owe, and never did owe, a single dollar to the plaintiff on that judgment, or in any other way; that the plaintiff’s claim was fictitious and he, the defendant therein, was altogether innocent of the charges therein made and should be so considered, notwithsanding the verdict found by the jury and affirmed by the court.
In less than a year after that suit was brought, and after issue had been joined and when a trial was imminent, Doran executed this deed of trust to the building association. There is no explanation given why he, who up to that time had been apparently in prosperous circumstances, should then find it necessary to encumber his property to the extent of $1,500. . On the 14th of November 1888, judgment was given on the verdict, and on the same day a motion for a new trial was interposed. It is particularly alleged in the bill, and appears from the evidence, that Doran procured a promise from the plaintiff’s counsel that no execution should issue on the judgment until the motion for a new trial should be disposed of and that motion was not decided until January, 1889; but just before that time, while the counsel were still withholding an order for an execution in compliance with their promise, they discovered that on the 28th of November, 1886, only fourteen days after the judgment had been rendered, this deed was executed to Stewart. The deed recited that in consideration of $600, in hand paid to Stewart by Doran, all the right and title of Doran was conveyed to Stewart subject to the charge upon the property of $1,500 due to the building association which Stewart stipulated to pay. That deed was recorded on the 30th of November, and on the 20th of February following the present bill was filed. Doran and Stewart neglected to answer, and a decree pro confesso was obtained against them in March. That decree was stricken out and their answers were filed on the 2d of April, 1887, to which exceptions were at once filed for *167 insufficiency in various respects. On the 8th of May counsel who had filed these answers, and who had defended Doran in the suit at law, withdrew from the case. Nothing further was done, although there was a motion made to compel Doran to employ new counsel, until June 1889, more than a year afterwards, when new answers were filed in their behalf.
When the case was before the .court at a former term much reliance was placed, as we see from the briefs, upen the assumption of fact that in the answers each of these defendants had sworn away the equities of the bill. An examination at the present hearing of the first so-called answers disclosed that they were never entitled to be considered as answers at all. The paper which was filed and relied on as the answer of Patrick Doran to the original bill we find was never signed or sworn to by Patrick Doran at all. It is signed and sworn to, in fact, by Thomas W. Stewart. The answer which is entitled and purports throughout to be the answer of Stewart in a similar way was signed by Patrick Doran, and professed to have been sworn to by him. The verification made by the defendants to the wrong papers is not in the form required by the 88th equity rule, but is as far from a compliance with its requirements as it is possible for a verification to be. It is perfectly plain there could be no indictment for perjury against Doran or Stewart on either of these answers, and that these papers were not answers at all. So far, therefore, from the supposed answers having sworn away the equity of the bill, it was not answered at all at that time.
It is stated, however, in argument by the counsel who now represent Doran and Stewart, that complainant’s counsel : agreed this, fatbal fault should be overlooked. The opposing counsel deny this was the understanding, but only admit that when the attention of the new counsel was called to this admission, accidental or intentional, they only said the parties might swear to them then, but not consenting to waive the objections . to their defects. We are for *168 bidden by our rules, to notice such verbal agreement. While it is possible the present condition of the papers may have been the result of accident, there is no allegation or proof that such was the case. On the other hand, if these papers had been placed in the hands of these two defendants to be sworn to by them, and they had been afraid to verify their assertions therein, then it would have been a simple and yet not easily detected device to mismatch them, and thus escape the dangerous consequences of false swearing. Whatever may have been the motive’, the fact remains that the argument relied on at the former hearing, that the answers had neutralized the force of the complainant’s charges, was without foundation. This defect appears not to have been observed by complainant’s counsel, who, assuming they were regular in this particular, filed exceptions to the so-called answers upon the ground that the parties had not answered the eleven pointed interrogatories, nor fully answered the general allegations of the bill, and calling for new answers. The attention of the court below not having been called to the defect, the exceptions were examined as if made to answers sufficient in these essentials, and several of the exceptions were sustained, and the defendants were required to make further answer to the general charges of the bill and of several of the interrogatories. The present counsel then filed what were called additional answers, which only professed to answer further to a few of the points, but do not go over the whole case. For example, in the additional answer of Doran, he only professed to respond to the fifth paragraph of the bill and to the sixth and seventh interrogatories, without making any reply whatever to all the rest of the bill. Not a word is said, for example, in reply to the very important averment of the bill, that Doran having determined he would not pay this debt, went in turn to three attorneys of the court, Messrs. Brooke, O’Neal, and Rldout, and endeavored to employ them to help him in the preparation of a deed to avoid the effect of this judgment. The defendant is called upon to answer this charge, but nothing *169 at all is said in reply, and both the new and the original answers being nullities, the charge is altogether unanswered.
The case then went to the taking of testimony, and the complainant presented all the witnesses he reasonably could. He brought as a witness his counsel in the case to show the promise by complainant’s counsel had been obtained by Doran to suspend execution upon the judgment, under the pretext that if they would wait until a decision had been made upon the motion for a new trial Doran, if it should be overruled, would give a satisfactory supersedeas bond which would secure the debt; and that he took advantage of this interval to endeavor to get the deed to Stewart prepared, which he hoped would deprive the plaintiff of all .chance to realize on his judgment.
Evidence was produced as to the value of the property. Mr. Walker, a real estate agent, who had been familiar with the value of property on Capitol Hill, said the house was worth from $2,800 to $3,100. Though this testimony is not conclusive, it is quite enough to show it was worth more than was assumed to be its value when Stewart professed to buy it. There was then from $1,200 to $1,300 due to the Association on the property, and Stewart claimed to have paid $600 additional, making $1,900, instead of $2,800 to $3,100, a difference of at least one-third, which was very considerable in view of the small amount involved.
Two of the lawyers named in the bill were examined by the complainant, and asked whether the charge in the bill as to Stewart’s application and their refusal, was correct. The transaction with which O’Neal was concerned was an attempt by Doran to get O’Neal, as a lawyer, to arrange some way by which the small amount of his personalty which had been taken on the execution, amounting to $66.98, might be considered as the property of a Mrs. Hill. When asked whether he looked upon the whole transaction as a subterfuge on the part of Doran to re-invest himself in a part of this property, he answered, that he looked upon the transaction as shady, and advised him against putting this *170 woman into trouble, by which her little property would go, and advised her not to go on the bond in the case, as the transaction was shady.
When' O’Neal and Brooke are asked the distinct question, whether or not ‘Doran did not ask them to prepare a deed for the purpose of avoiding the effect of the judgment, they both declined to answer. The question was certified to the equity court, and the court deciding that they had the right to decline to answer, no further evidence from them was obtainable.
But certain reflections arise when counsel plead their privilege as a reason for not answering such a question. Surely no professional confidence would require silence under such circumstances if the charge was untrue.
The counsel for the complainant then asked Doran to authorize his counsel to answer this question. One word from him would have sufficed to procure valuable testimony in Doran’s favor if the transaction was an honest one. He had but to speak one word to enable him to obtain from the attorney absolute proof that the charge in question was untrue; but that word he refused to speak. No one could examine this incident without becoming convinced it is in itself a suspicious circumstance.
That was about all the evidence the complainant could reasonably, obtain. He did not run the risk of putting these defendants on the stand; but they themselves had the right to state at length any exculpatory fact, yet they did not see fit to run the risk of going on the stand. Here was a charge against two men, of fraud, conspiracy and collusion to cheat, and with the means of acquitting themselves if they were unjustly accused, they refrained from going on the stand. Would any honest men silently allow themselves to be charged with such fraud, and refuse to testify when they had the means of instantly putting down the slander, if such it were, by presenting themselves as witnesses? Not only ' did Doran and Stewart refuse to present themselves as witnesses in their own behalf, but no third person in this Dis *171 trict is produced to say a word in their behalf. The transaction appears to have been conducted in absolute secrecy without a witness. Doran had resisted at every step the recovery of the judgment for $600; but he surrendered every particle of his remaining property without consultation with any friend or adviser, as if it were the most unimportant trifle. Although the first so-called answers cannot be considered as evidence in their favor, yet they may be examined and compared as declarations on their part of the transaction. Doran says that at the time of the rendition of the judgment against him he was indebted to divers persons in this District, several of whom held his promissory notes, and that he sold his interest in this property in order to be prepared to meet these obligations, consisting for the most part of notes given for borrowed money, as he had always endeavored to do, believing it to be his first duty to pay back money borrowed of those who had relied solely upon his honesty; and he says said judgment was in no way a lien upon his property.
In the interrogatories he is asked for the names of any persons, creditors of Doran or otherwise, to whom he pretends to have disbursed the money received from Stewart, the amounts paid them and their residences. Here is his full answer: “That he received the purchaser’s note for the said sum of $600.” This is no response to the demand to tell who received this money and the circumstances connected with it. In his subsequent answer, his memory seems to have greatly improved, and he says: “And further answering the sixth interrogatory, the detendant says, that with the notes he repeived in payment for said real estate from said Stewart, he paid a debt to Michael Rady, who resides somewhere in the State of Georgia, his exact residence not being known to the defendants.”
Georgia contains only 1,800,000 people, and it is somewhere in Georgia that this man is to he found. There is no production of any .receipt of the money from Rady and no evidence whatever of the indebtedness.
*172 He further answers that he paid a debt to John Joy Edson, of Washington, D. C, with one of said notes, amounting to the sum of $40. Mr. Edson was president of the building association, and he had to pay him as such', money from time to time; but no receipt was brought here to show that it was not an ordinary payment to the building association.
Then he says his co-defendant Stewart took up notes amounting to $300, and gave this defendant cash for them, and he applied the money to defraying his general expenses, and also to the payment of his notes that had been discounted at the Second National Bank and in the Columbia National Bank of Washington, D. C.; that he indorsed one of said notes, amounting to $170, to Mrs. L. P. Martin, of Birmingham, Ala., in payment of a debt he owed her, amounting to said sum, and that he now has in his possession one of Stewart’s notes amounting to $50.
Mr. Stewart, in his amended answer, says: “I do not know what disposition the defendant Doran has made of said note. Pie got me to divide the amount left into several notes, so that he could realize on them, as he told me he needed some money.”
If it had been true, as stated by Doran, that his co-defendant Stewart took up notes amounting to $300 and gave him, Doran, the cash for them to be applied to his general expenses, Mr. Stewart could hardly have said, “ I do not know what disposition the defendant Doran has made of said notes,” for he would then have known what disposition had been made of $300 of them at least.
But the most peculiar fact is, there is no testimony or statement (except what these men say in the so-called answers) that there ever was a note given at all by Stewart. The deed says the consideration was cash in hand paid, and the alleged notes are not produced. Those notes which were paid by Stewart should be, undoubtedly, in his possession; and the note which Doran says he paid in Georgia to Michael Rady would either have come back here, or he would have a receipt for the amount. The same is true of *173 the note said to have been paid to Mr. Edson, and of those said to have been paid to the Second National Bank and to the Columbia National Bank, and to Mrs. Martin; and yet there is not the scratch of a pen of any description on the subject.
The same contradiction appears as to knowledge of the judgment on the part of Stewart. In the first answer Do-ran says the judgment was not in any way a lien upon the said property. In this he agrees with his counsel here, who argued that a judgment could not be rendered until after the motion for a new trial was overruled; but the docket shows, as is our practice, that the judgment was entered on the 13th day of November instantly on the rendition of the verdict. Doran says he does not know whether the defendant Stewart knew of the exact condition of the litigation between himself and the complainant, but he satisfied himself the title was good, subject to said incumbrance to secure the building association.
Mr. Doran, in his answer to the eighth interrogatory, first says: “The defendant, Mr. Stewart, knew that I had or was having some litigation with the complainant at the time he purchased said property from me. He made his own inquiries about the matter, and can best answer as to the extent of his knowledge.”
As they were in the same room in the same office, and there seems to have been no one between them and they seem to have been intimates, of course there can be no doubt that Stewart really knew all about the matter.
Mr. Doran, in his further answer to the bill, says: “Further answering, the defendant says that his co-defendant Stewart was not aware of the rendering of any judgment in favor of DeWalt against this defendant, to his knowledge, at the date of the purchase of the real estate mentioned in the complaint.”
Stewart’s statement is of importance in this connection. In his first answer, he stated that he had no personal knowledge as to whether the judgment referred to against the *174 said defendant Doran had been rendered at the time or not; but that he was advised there was no lien on the said property by reason of the said litigation, at the time he purchased the same from the defendant Patrick Doran.
Again, in answer to the interrogatories, he says: “ I had no personal knowledge of the result of the litigation between the complainant and defendant Doran, but heard that the complainant had gotten a verdict against him for the amount claimed in his bill of complaint, but was satisfied that no lien by reason thereof had been obtained as against the property described in said bill, and that I would get a good title thereto.”
When he is required to answer again, he says: “At the time of the conveyance of said real estate to him by Patrick .Doran he was not informed or aware of the existence of any judgment against Doran in favor of the complainant.”
It seems to us that in these most important points in the case such circumstances of suspicion against these parties appeared as made it absolutely incumbent upon them to adduce proof of the consideration satisfactory to the court, and also to show that Mr. Stewart had no knowledge or notice of the existence of the judgment, and that he knew of no facts from which a reasonable man would reasonably deduce the idea that his object was fraudulent in parting with everything he had in the world at that time.
There are some principles applicable to this case deserving consideration.
The deed alleges the consideration is cash, not notes. It is spoken of in one of the answers, which may have been a verbal inaccuracy, as a note received from Stewart.
A false statement of the consideration for a transfer tends to deceive creditors, and is a badge of fraud. (Bump on Fraudulent Conveyances, 42.)
There is nothing to show the time the notes were to run. If an unusual time was given it would be a badge of fraud (Bump, 47), and we should be informed upon the point.
When circumstances exist raising a doubt of the fairness *175 of the transaction, the vendee must prove an adequate consideration. The transaction is scrutinized more closely, and the same disparity is not required as in controversies between vendor and vendee. (Bump, 44.)
As laid down in a very recent case by the Supreme Court (Crawford vs. Neale, 144 U. S., 559), the burden is on the attacking creditor; but where the fraudulent intent on the grantor’s part is made out, and the circumstances are suspicious, the purchaser must show that he paid full value, and if he does it must then appear that the purchaser .had notice of the fraud. •
The omission of the grantee to testify, or to produce the debtor or any other important witness, is the ground for an unfavorable presumption, and frequently exercises an important influence upon the final determination of the question of fraud. (Bump, 52, 53.)
When the fraudulent intent of the grantor is shown, it is-incumbent upon the grantee to establish the payment by competent evidence, for the proof is almost exclusively within his knowledge and power.
The facility with which fictitious payments may be fabricated renders it necessary for him to produce all the proof thajt may reasonably be supposed to be in his power, of the reality and fairness of the transaction, and the want of clear proof is evidence of fraud. Such proof is vital to uphold a transaction in other respects surrounded with suspicion. (Bump, 53, 54.)
Where the grantee, without any notice or knowledge, or reasonable grounds for suspicion of mala jides on the part of the grantor, purchases property for a fair price, fraud of the grantor cannot impugn his title. On .the other hand, if the grantee has actual notice of the grantor’s fraudulent intent, of course the transfer is void, however honest may have been the purpose of the grantee. “ It is not necessary that the grantee should have actual knowledge of the debtor’s intent to delay, hinder or defraud his creditors, to render the transfer void. A knowledge of facts sufficient to *176 excite the suspicions of a prudent man and to put him on inquiry, or to lead a person of ordinary perception to infer fraud; or the means of knowing by the use of ordinary diligence, amounts to notice, and is equivalent to actual knowledge in contemplation of law — res ipsa loquitor." (Bump, 20.)
It is not necessary the debtor and the grantee shall be actuated by like motives, to cheat and defraud the grantor’s creditors. The motives and intentions of the grantor and grantee may be different. If with such knowledge of facts as would put a prudent man on inquiry, or leave him to infer a. purpose to hinder, delay or defraud creditors, he purchases because he considers the ■ property cheap, and this is the only motive that induces him to purchase; or he buys because he desires to save a debt due to him by the grantor, the transfer nevertheless will be held fraudulent.
In Zimmer vs. Miller, 64 Md., 300, the following language is used:
“ In order to justify the annulment of a deed it is there-, fore necessary to prove a fraudulent intent, and here an apparent difficulty is interposed; for although the actions of men can be conclusively proven, the motives which lurk in their bosoms and control their actions are not susceptible of positive proof. In most cases fraud must be inferred from facts established by competent evidence. As has been said by the Supreme Court of Michigan, in the very recent case of Hough vs. Dickerson, 24 Northwestern Reporter, 812: ‘ Fraud, like any other fact, may be proved by any facts or circumstances which satisfy the mind by a preponderance of the evidence in any given case of its existence, and many times it is inferred, and properly so, from circumstances, and often cannot be proved in any other way.’ As was said by this court, in Ecker vs McAllister, 45 Md., 309, ‘The intent with which a grantor executes a deed must be gathered from the deed itself, and from his acts and the surrounding circumstances.’ It would therefore seem to be an established rule that when those circumstances are *177 of such a character as to lead to the inference that there has been a fraudulent intent, the onus of disproving fraud rests on the parties to the transaction. As the court said in the case just cited, ‘ Every person of sound mind is presumed to intend the necessary, natural or legal consequences of his deliberate act.’ If, therefore, the grantor, knowing that he has creditors, makes a disposition of his éntire property, placing it beyond their reach, under such circumstances as appear in this record, it may be presumed that he was actuated by an intent which ought not to receive the sanction of a court of equity; and when he is confronted by this presumption, it is incumbent on him to meet it with countervailing proof. . . .
“As Chancellor Kent remarked in an analogous case, ‘To rest entirely on the naked assertion of payments, without any proof in support of them, is a circumstance leading to the most unfavorable inferences.’”
The court then refers to the case of Callan vs. Statham, 23 Howard, 477, which contains a reliable guide as to the law on the subject. The case, which' went from this jurisdiction, was a creditor’s bill, filed by Statham and others, to set aside a deed made by Callan and wife to M. P. Callan. Judgments to the amount of $3,000 had been recorded against Callan. That bill was answered, and the answer, at that time, only stated that the consideration was sufficient, and was paid. A second bill was filed by Sherman, and the suits were consolidated. In the answer to that suit, Callan stated the consideration as $4,000, and that it was paid by the surrender of a note that he held against the other party, and $900 cash; and that the payment was not made in the presence of other parties.
Callan was heavily in debt; several suits were impending over him, and maturing to judgment, to which the property in question would have been subject. The conveyance was made to' his brother for the consideration stated in the deed, of $4,900. The premises conveyed, according to the estimate of witnesses who were well acquainted with them, *178 were worth at the time exceeding $15,000, assuming the-title to be good. The vendor continued to possess and occupy the property after the conveyance, as before, leasing the buildings and collecting the rents in his own name, and not accounting to the vendee for the same. The opinion says:
“No proof was given by the defendants in respect to the payment of the consideration, with a view of sustaining the allegations in the answer. They rely entirely upon the rule of pleading, that the answers are responsive to the bill, and are to be taken as true till overthrown by proof on the other side. As they aver the payment was a transaction between themselves, and the principal part a note held by the vendee, which he surrendered, the evidence in respect to which is therefore exclusively within their own knowledge, it would have been more satisfactory if they had given some proof in support of the answers, especially when there were other accompanying circumstances, tending to excite distrust and suspicion as to the bona fides of the deed.
“But independently of this consideration, there are other facts in the case that may well justify the decree below, the most important, perhaps, the unsatisfactory evidence, on the part of the Callans in respect to the payment of the consideration stated in the deed. This proof was vital in order to uphold a deed in other respects surrounded with suspicion. The evidence was in their possession, and their admission that the transaction was secret made the proof still more indispensable on their part. The want of it, under the circumstances, is nearly, if not quite, fatal to the validity of the deed as against creditors. The continuance of the vendor in the possession and occupation and full enjoyment of the premises, the same after the deed as before, and absence of interest in the subject manifested by the vendee, are circumstances not satisfactorily explained; also the heavy indebtedness of J. F. Callan, and suits pending and maturing to judgment — all well known to the vendee.”
Nobody can doubt the facts here proved notice to *179 Stewart as to this judgment, and bring him precisely within the category spoken of by the Supreme Court. What sensible man, talking with Doran, on being applied to to buy this property, knowing that a verdict had been given against him, would have doubted for one instant the object in his mind, in agreeing to put himself out of house and home and become a tenant to another,, for no explained purpose? If the property was really worth from $2,800 to $3,100, then Doran was giving up (admitting it to be a genuine transaction) the difference between $1,900 and $2,800 or $3,100.; and agreeing to pay rent, at the rate of $16 a month, apparently for nothing at all; that is, he was giving the difference between the real value and the assumed value, and paying rent, for nothing. If, on the other hand, the property was only worth $1,900, then it was a most extraordinaiy bargain for Stewart to make. He would then have been paying for the chance of getting this rent hereafter, the interest on the balance due to the building association; besides losing the interest on $600, and paying taxes on the property, with insurance and repairs, — a most unprofitable and unsatisfactory sort of bargain, one would think; and made apparently without any assigned reason. There is only one explanation of it, and that is that he wanted to help Doran to defraud the complainant.
Another important circumstance must be noticed. Immediately after this judgment was rendered, and before the deed was made to Stewart, Doran went to the building association and applied to borrow more money on this property. He had nearly stripped himself of everything. As soon as he found the suit was going to be tried, he had incumbered the lot for $1,500. He now wanted to borrow more money from the building association, which' they refused to give him. He then went to Mr. Stewart, as he alleges, and the result was the alleged sale for $600 of every possession he held in the world.
There is a variety of circumstances in the case which I need not mention. We know that when • men intend to *180 cheat their creditors, they do not go to the house-top and sound a trumpet, and call everybody to be present and witness the act; the deed is done in silence and in secrecy. Some confidential friend is found, and the parties select their own time and manner of accomplishing their object.
The only proof usually attainable is derived from the assembling of a variety of incidents, each perhaps trivial in itself, but which, by an induction of particulars, may suffice to bring conviction to the minds of the court. Of course, these must together amount to proof, so as to satisfy the conscience of the court, because the presumption is in favor of the validity of the deed; but when these suspicious circumstances on the part of the grantor have been shown, and the grantee, with means of proof in his own hands,- refuses- or neglects to say a word to satisfy the conscience of the court, and relieve himself of the charge of turpitude, there can be but one conclusion.
We think on the strength of numerous cases of the highest authority, we are fully justified in affirming the decree below and setting this deed aside. We will sign a decree annulling the former decree of the General Term which reversed the decree below. There are some matters in the decree below which do not seem to us to be exactly right; but there will be a decree signed annulling the deed as-fraudulent and void, and giving a right to the party to have the property sold for the payment of his judgment and costs.